## UNITED STATES v. McGRORY.

### No. 2738.

Circuit Court of Appeals, First Circuit.

Feb. 18, 1933.

William H. Hession, of Boston, Mass., Chief Atty., Veterans' Administration (Henry M. Boss, Jr., U. S. Atty., and Edward F. McElroy, Asst. U. S. Atty., both of Providence, R. I., and Davis G. Arnold and C. L. Dawson, both of Washington, D. C., Attys., Veterans' Administration, on the brief), for the United States.

James B. Littlefield, of Providence, R. I., for appellee.

Before BINGHAM, WILSON, and MORTON, Circuit Judges.

WILSON, Circuit Judge.

This is an appeal from a judgment of the District Court of Rhode Island in an action at law to recover a sum alleged to be due under a war risk insurance policy issued to the plaintiff-appellee. The plaintiff based his claim for compensation on injuries received while in the service and resulting in permanent total disability while his insurance was in force. A jury trial was waived. The

District Court found in favor of the plaintiff, and awarded judgment for $8,222.50.

The plaintiff entered the service on July 27, 1917; was honorably discharged on June 27, 1919; re-enlisted June 28, 1919, and was again honorably discharged July 15, 1920. War risk insurance was granted him on his application on February 5, 1918, providing for the payment of $10,000 in case of his death, or $57.50 monthly in case of permanent and total disability. The plaintiff paid his premiums until October, 1919, but on September 2, 1919, he requested that his insurance policy be discontinued.

Testimony was introduced from physicians connected with the Veterans' Bureau and from men by whom or under whose supervision he had been employed from the time of his discharge from the service until 1930.

There seems to be no doubt but that this plaintiff received a leg injury in the barbed wire entanglements during the St. Mihiel drive, and suffered during his period of service from what was then diagnosed as varicose veins, which interfered with his drilling and marching, and also appears to have suffered from either gas or shell shock. At some time during this period he was in the hospital, and no doubt was temporarily totally disabled. However, on June 28, 1919, he enlisted again, and, so far as the record shows, was accepted by the examining physicians and performed such duties as were assigned to him as a soldier until he was discharged in July, 1920.

At the close of the oral testimony offered on each side, the defense filed a motion that judgment be entered for the government. The District Court thereupon expressed doubt as to the right of the plaintiff to recover, but made no ruling at the time on the government's motion. Instead, the District Court suggested that the evidence be transcribed and submitted to a certain physician, named by the presiding justice as one in whom he had great confidence, who, after examining the evidence, should advise the court as to whether the plaintiff was suffering from permanent and total disability during the period in which the policy was in force.

To this procedure both parties assented, and that the presiding justice might consider the advice of the physician. The report of the physician must therefore be treated as the introduction of additional evidence. The District Judge so treated it, and in his decision said: "Basing my findings up-on all the evidence in the case as supplemented by this report, I find," etc.

The bill of exceptions approved by the presiding justice states that "at the conclusion of the testimony the defendant moved for judgment * * * whereupon the court found for the plaintiff and noted defendant's exception to the denial of the motion for judgment."

A majority of the court are of the opinion that this statement in the bill of exceptions warrants the presumption that the motion for judgment filed at the close of the oral testimony was renewed by the defendant before judgment, and an exception was duly taken.

It then raises a question of law as to whether there was any evidence on which the judgment can rest. We think not only was there no evidence on which the judgment can rest, but the evidence shows conclusively that the plaintiff's injuries did not result in permanent total disability during the period the contract of war risk insurance was in force.

The War Risk Insurance Act, § 13 (40 Stat. 555) provides "that the director, subject to the general direction of the Secretary of the Treasury, shall administer, execute, and enforce the provisions of this Act, and for that purpose have full power and authority to make rules and regulations not inconsistent with the provisions of this Act, necessary or appropriate to carry out its purposes, and shall decide all questions arising under the Act, except as otherwise provided in section five."

The Treasury Department issued the following regulation defining what constitutes permanent and total disability as follows:

"Any impairment of mind or body which renders it impossible for the disabled person to follow continuously any substantially gainful occupation shall be deemed, in Article III and IV, to be total disability.

"'Total disability' shall be deemed to be 'permanent' whenever it is founded upon conditions which render it reasonably certain that it will continue throughout the life of the person suffering from it."

In construing these policies, it must be borne in mind that there may be permanent partial disability, and also temporary total disability, but neither constitutes permanent total disability and permits a recovery under a war risk insurance policy on that ground.

There is really no ambiguity in the phrase permanent total disability. It must, first,

be such a disability, while a war risk policy is in force, as is reasonably certain to continue through life, and, secondly, will prevent any continuous employment in any gainful occupation. An unsuccessful effort to continue such employment will not prevent recovery, Ford v. United States (C. C. A.) 44 F.(2d) 754, but a reasonably continuous employment over several years, subject to only such interruptions as may be due to the nature of the employment or illness, such as a normal person might be subject to, or even interruptions due to a partial disability, does not constitute permanent total disability. United States v. Peet (C. C. A.) 59 F.(2d) 728. As one judge, though in a dissenting opinion—the majority opinion merely holding that the case should be submitted to a jury—has aptly phrased the definition of this term:

"It seems to me axiomatic that, whatever might be the rating to be given to an insured prospectively, he cannot be said to have been permanently and totally disabled at the time of the lapse of his policy—with which time we are alone concerned—if between that time and the time of bringing suit, a number of years later, there were substantial periods of time during which the insured was able to perform without injury to himself, and did perform with reasonable regularity, and for gain, a material part of the world's labor, be such labor mental or physical, heavy or light. During such periods he was at best but partially disabled, whether his disability be regarded as total for but a part of each day, month, or year, or as embracing some part only of the work ordinarily open to each individual, or both. In each such case the permanency of the total disability, judged as of the date of his discharge, has been completely and conclusively negatived by the showing of substantial periods of time during which it did not exist." Bartee v. United States (C. C. A.) 60 F.(2d) 247, 251.

The record discloses that in July, 1919, and shortly after his second enlistment, he was permitted to return home for a month, and then reported at a camp in Georgia, where he served out his enlistment. During his stay in camp he was hospitalized for treatment of his leg and an operation, following which he had charge of some men in the Georgia camp, until he was discharged from the service on July 15, 1920. It was while he was in the Georgia camp that he ordered his war risk insurance terminated. On August 5, 1920, he entered the employment of the United Electric Railways at Providence, R. I., and his earnings from August 5, 1920, until December 24, 1920, were $479.65, or over $100 per month. During the year 1921 he was employed by the same company and his earnings were $921.95. In 1922 he earned $497.30. This employment ended on October 6, 1922. During the period of this employment, plaintiff was only a spare man and worked as a conductor.

On September 27, 1923, the plaintiff commenced to work for the Providence Gas Company, and continued in this employment until September 13, 1924. During the year 1923 he earned $363.45, covering the period from September 27, 1923, until January 1, 1924, or about $120 per month. This employment was at the rate of 45 cents an hour for a 54-hour week, or a maximum total of $24.30 per week. The record of this company showed that the plaintiff earned more than $24.30 every week, which indicated considerable overtime. For the period from January 1, 1924, to September 13, 1924, the plaintiff was paid by the Providence Gas Company $1,037.88, or over $120 per month. He was employed at the same rate of pay, and worked overtime a few hours practically every week.

The plaintiff entered vocational training as a glass worker at the Franklin Glass Company, Providence, R. I., on February 16, 1925, and was in this training altogether for one year and nine months, during which time the government paid him $160 a month. He was declared rehabilitated on December 31, 1926.

The plaintiff again entered the employment of the Providence Gas Company on September 20, 1926, and continued until January 14, 1930, or continuously for over three years. His rate of pay at the time of this employment was 45 cents an hour, and this was increased to 50 cents an hour on October 29, 1928. From September, 1926, until the end of the year, he earned $368.53, and worked overtime in September, October, November, and December. In 1927 he earned $1,214.05, and worked overtime during that year. In the year 1928 he earned $1,305.24, and worked overtime during that year. In the year 1929 he earned $1,329.75, and worked overtime. His employment terminated, as stated above, on January 14, 1930, and he was paid $54.25 for that part of January.

While the plaintiff testified that he was favored by his employer in some of these employments, and was given comparatively easy jobs, still his earnings show that his employment was not sporadic, but was as con-

tinuous as a spare man could reasonably expect, or, when employed regularly, his earnings were as much as the average unskilled workman would ordinarily receive.

That during the period from his discharge until he ceased work in January, 1930, he was at times temporarily incapacitated, due to trouble with his legs, and received compensation for total disability under the World War Veterans' Act 1924 (38 USCA § 421 et seq.) for short periods, and was rated as partially disabled during much of the time and received compensation pro rata is true, but the records of the Veterans' Bureau from September 21, 1922, to January 16, 1930, disclose that during that period he was not rated as totally disabled, except during short intervals from October 14 to November 17, 1922; from September 10, 1924, to February 15, 1925; that during the remainder of the more than 7 years covered by the report, he was rated as partially disabled, from 19 per cent. in 1922 to 75 per cent. just before he ceased working in 1930. During the greater portion of the time he was rated as 25 per cent. partially disabled. His income during much of the nine year period from August, 1920, to January, 1930, except during the periods of total disability, disclosed little, if any, impairment in earning power.

The District Court based its decision largely on the report of the doctor to whom the evidence was submitted at the close of the testimony, but this physician's report, when carefully read, goes no farther than to express an opinion that the plaintiff is now suffering from an interference in the arterial circulation in the legs, instead of the veins, as his trouble was previously diagnosed; and that the cause may be traced to some injury during the period of his service, and has been progressive, so that the subject is now permanently and totally disabled.

The physician, however, does not state that at any time prior to 1930 while plaintiff was working, often overtime, and was earning from $1,000 to $1,200 a year, that he was totally disabled or that he was totally disabled at the expiration of his policy of war risk insurance. He merely says a progressive disease began and incapacitated him while in the service, though to what extent, during the time his policy was in force, he does not say, but concludes that, at the time of his examination in 1932, the plaintiff would never be able to work again. That he received the injury during his service, which, after 10 years, has now resulted in permanent and total disability, is not sufficient to permit recovery under his policy of insurance, which expired not later than October 5, 1919.

The following cases, and many others which might be cited, support this conclusion: United States v. Rice (C. C. A.) 47 F.(2d) 749; United States v. McGill (C. C. A.) 56 F.(2d) 522; United States v. Perry (C. C. A.) 55 F.(2d) 819; United States v. Dougherty (C. C. A.) 54 F.(2d) 721; United ed States v. Fly (C. C. A.) 58 F.(2d) 217; Nordberg v. United States (D. C.) 51 F.(2d) 271; Nalbantian v. United States (C. C. A.) 54 F.(2d) 63; United States v. Lyle et al. (C. C. A.) 54 F.(2d) 357.

We are not unmindful of the suffering that this plaintiff must now undergo from a cause originating while in the service, but it is evident that the government has not been unmindful of its duty toward him for the injury he thus incurred. It has paid him continuously for partial disability, and at times for total disability. It paid him $160 per month during a period of a year and 9 months while training for rehabilitation, at the end of which he was pronounced rehabilitated. He is now receiving over $100 per month on a total disability rating, and will receive it presumably as long as he lives. It is not a case of the government refusing to take care of a soldier injured in the service. The government is hiding behind no technicality. It has meritorious grounds for insisting that to permit recovery under a policy terminated at the plaintiff's request would be unwarranted under the undisputed facts in this case.

The judgment of the District Court is reversed, and the case is remanded to that court, with direction that judgment be entered for the defendant.